IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA17-480

 Filed: 4 December 2018

Watauga County, No. 16 CRS 50554

STATE OF NORTH CAROLINA

 v.

PATRICK MYLETT

 Appeal by defendant from judgment entered 2 February 2017 by Judge Marvin

P. Pope, Jr. in Watauga County Superior Court. Heard in the Court of Appeals 24

October 2017.

 Attorney General Joshua H. Stein, by Solicitor General Matthew W. Sawchak,
 Deputy Solicitor General James W. Doggett, and Deputy Solicitor General Ryan
 Park, for the State.

 Goodman Carr, PLLC, by Rob Heroy, for defendant-appellant.

 CALABRIA, Judge.

 Patrick Mylett (“defendant”) appeals from the trial court’s judgment entered

upon a jury verdict finding him guilty of conspiracy to commit harassment of a juror

pursuant to N.C. Gen. Stat. § 14-225.2(a)(2) (2017). After careful review, we conclude

that defendant received a fair trial, free from error.

 I. Background

 In August 2015, defendant and his twin brother (“Dan”) were enrolled as

students at Appalachian State University in Boone, North Carolina. On 29 August
 STATE V. MYLETT

 Opinion of the Court

2015, the brothers were involved in a fight at a fraternity party. Dan was

subsequently charged with assault on a government official and intoxicated and

disruptive behavior. On 31 March 2016, a Watauga County Superior Court jury

returned a verdict finding Dan guilty of assault on a government official. After

sentencing, defendant, Dan, and Dan’s girlfriend (“Kathryn”) loudly confronted six

jurors about the verdict as they exited the courtroom and retrieved their belongings

from the jury room. One juror reported the incident to the courthouse law

enforcement officer, while another juror discussed the matter with the assistant

district attorney.

 On 19 April 2016, defendant was arrested and charged with six counts of

harassment of a juror and one count of conspiracy to commit harassment of a juror.

On 18 July 2016, the Watauga County grand jury returned bills of indictment

formally charging defendant with these offenses. Dan and Kathryn were also

separately charged and tried for the same offenses.

 Defendant’s trial commenced during the 30 January 2017 criminal session of

Watauga County Superior Court with a hearing on several pretrial motions.

Defendant filed pretrial motions to dismiss all charges as unconstitutional, arguing

that the juror-harassment statute, N.C. Gen. Stat. § 14-225.2(a)(2), (1) violates the

First Amendment, both on its face and as applied to his conduct; and (2) is

unconstitutionally vague. Defendant also filed a pretrial motion in limine, pursuant

 -2-
 STATE V. MYLETT

 Opinion of the Court

to N.C. Rules of Evidence 404(b) and 802, requesting the trial court to order the

State’s “witnesses not to make any references to a fight or fights in which [defendant]

or [Dan] participated.” The trial court denied each of defendant’s motions, but stated

that the ruling on his motion in limine was “subject to being reopened based on the

form of the question that is asked” at trial.

 At trial, all six jurors testified as witnesses for the State. Following the State’s

presentation of evidence, defendant renewed his pretrial motions for dismissal and

further moved to dismiss all charges for insufficient evidence. After the trial court

denied his motions, defendant presented evidence, including his own testimony, and

subsequently renewed his motions for dismissal at the close of all evidence.

 At the charge conference, defendant requested that the trial court provide the

jury with a definition of “intimidate,” which is not defined by statute. See N.C. Gen.

Stat. § 14-225.2. The State opposed defendant’s motion, along with his proposed

definitions. The trial court denied defendant’s motion, and the jury was not provided

with a definition of “intimidate.”

 On 2 February 2017, the jury returned verdicts finding defendant not guilty of

six counts of juror harassment, but guilty of one count of conspiracy to commit juror

harassment. The trial court sentenced defendant to 45 days in the custody of the

Watauga County Sheriff, suspended his active sentence, and placed defendant on 18

months of supervised probation. The trial court also ordered defendant to serve 60

 -3-
 STATE V. MYLETT

 Opinion of the Court

hours of community service, enroll in anger management, and obtain 20 hours of

weekly employment.

 Defendant appeals.

 II. Constitutionality

 On appeal, defendant argues that the trial court erred by denying his motions

to dismiss on the basis of the constitutionality of the juror-harassment statute.

Specifically, he asserts that N.C. Gen. Stat. § 14-225.2(a)(2) violates his First

Amendment right to free speech and expression; and (2) is void for vagueness. We

disagree.

 A. Standard of Review

 Constitutional challenges to statutes are reviewed de novo on appeal. N.C.

Ass’n of Educators, Inc. v. State, 368 N.C. 777, 786, 786 S.E.2d 255, 262 (2016). Yet,

even under de novo review, we begin with a presumption of validity. Id. “This Court

presumes that statutes passed by the General Assembly are constitutional, and duly

passed acts will not be struck unless found unconstitutional beyond a reasonable

doubt[.]” Id. (citations omitted); see also Wayne Cty. Citizens Ass’n for Better Tax

Control v. Wayne Cty. Bd. of Comm’rs, 328 N.C. 24, 29, 399 S.E.2d 311, 315 (1991)

(“Where a statute is susceptible of two interpretations, one of which is constitutional

and the other not, the courts will adopt the former and reject the latter.”).

 B. Implication of the First Amendment

 -4-
 STATE V. MYLETT

 Opinion of the Court

 In First Amendment challenges, the initial determination our Court must

make is whether the statute in question—N.C. Gen. Stat. § 14-225.2(a)(2) in the

instant case—triggers First Amendment protections. See State v. Bishop, 368 N.C.

869, 872, 787 S.E.2d 814, 817 (2016). To do so, we must determine whether N.C. Gen.

Stat. § 14-225.2(a)(2) “restricts protected speech or expressive conduct, or whether

the statute affects only nonexpressive conduct.” Id. at 872, 787 S.E.2d at 817. While

a seemingly simple task, this inquiry is not always straightforward or clear cut. The

United States Supreme Court has long sought to balance the protection of expressive

conduct—particularly when such conduct is “inherently” expressive—with the

exclusion of otherwise proscribable criminal conduct that just so happens to involve

written or spoken words. Compare Rumsfeld v. Forum for Acad. & Inst’l Rights, Inc.,

547 U.S. 47, 66, 164 L. Ed. 2d 156, 175 (2006) (extending First Amendment protection

“only to conduct that is inherently expressive”), with United States v. Alvarez, 567

U.S. 709, 716, 183 L. Ed. 2d 574, 587 (2012) (plurality opinion) (noting that “speech

integral to criminal conduct” remains a category of historically unprotected speech).

 Recently, in Bishop, the North Carolina Supreme Court examined the First

Amendment implications arising from our cyberbullying statute. 368 N.C. 869, 787

S.E.2d 814. The statute in question, N.C. Gen. Stat. § 14-458.1(a)(1), prohibited

individuals from “[p]ost[ing] or encourage[ing] others to post on the Internet [any]

private, personal, or sexual information pertaining to a minor” “[w]ith the intent to

 -5-
 STATE V. MYLETT

 Opinion of the Court

intimidate or torment a minor.” N.C. Gen. Stat. § 14-458.1(a)(1)(d) (2015). The Court,

in holding the statute applied to expressive conduct and therefore implicated the

First Amendment, reasoned the “statute outlawed posting particular subject matter,

on the internet, with certain intent[,]” and consequently “appl[ied] to speech and not

solely, or even predominantly, to nonexpressive conduct.” Bishop, 368 N.C. at 873,

787 S.E.2d at 817. The Court ultimately held the statute unconstitutional on the

basis of its violation of “the First Amendment’s guarantee of the freedom of speech.”

Id. at 880, 787 S.E.2d at 822.

 In the instant case, N.C. Gen. Stat. § 14-225.2(a)(2) applies to nonexpressive

conduct and does not implicate the First Amendment. N.C. Gen. Stat. § 14-225.2

provides, in part:

 (a) A person is guilty of harassment of a juror if he:

 (1) With intent to influence the official action of
 another as a juror, harasses, intimidates, or
 communicates with the juror or his spouse; or

 (2) As a result of the prior official action of
 another as a juror in a grand jury proceeding or
 trial, threatens in any manner or in any place, or
 intimidates the former juror or his spouse.

N.C. Gen. Stat. § 14-225.2(a) (emphasis added). When read in context, it is apparent

this language applies to a defendant’s conduct—threats and intimidations—directed

at a particular class of persons—jurors—irrespective of the content. Unlike the

language found in Bishop, which was a content-based restriction on internet posts,

 -6-
 STATE V. MYLETT

 Opinion of the Court

the language in this statute amounts to a restriction on conduct that is otherwise

proscribable as criminal. See, e.g., State v. Camp, 59 N.C. App. 38, 42-43, 295 S.E.2d

766, 768-69 (1982) (holding a statute barring the use of a telephone to harass another

individual does not implicate the First Amendment because the statute proscribed

conduct not speech); see also State v. Mazur, __ N.C. App. __, 817 S.E.2d 919 (2018)

(unpublished) (upholding the constitutionality of N.C. Gen. Stat. § 14-277.3A—North

Carolina’s stalking statute—because the statute did not implicate the First

Amendment). Accordingly, we hold N.C. Gen. Stat. § 14-225.2(a)(2) proscribes

conduct, not speech, and therefore does not implicate the First Amendment. We

therefore overrule Defendant’s argument.

 C. Content-Neutral Restriction

 However, even assuming arguendo N.C. Gen. Stat. § 14-225.2(a)(2) does

implicate the First Amendment, the statute satisfies constitutional requisites.

 The second threshold inquiry when examining the First Amendment validity

of a statute is whether the portion of the statute limiting speech is “content based or

content neutral.” Bishop, 368 N.C. at 874, 787 S.E.2d at 818. The outcome of this

determination governs the appropriate standard of scrutiny we must apply. If a

statute is found to be content based, we apply strict scrutiny under which the

restrictions “are presumptively unconstitutional and may be justified only if the

government proves that they are narrowly tailored to serve compelling state

 -7-
 STATE V. MYLETT

 Opinion of the Court

interests.” Reed v. Town of Gilbert, __ U.S. __, __, 192 L. Ed. 2d 236, 245 (2015). If,

however, we find the restrictions to be content neutral, we apply the less demanding

intermediate scrutiny. Bishop, 368 N.C. at 874, 787 S.E.2d at 818. Under

intermediate scrutiny, the State must prove that the statute is “narrowly tailored to

serve a significant governmental interest, and that [it] leave[s] open ample

alternative channels for communication of the information.” McCullen v. Coakley, __

U.S. __, __, 189 L. Ed. 2d 502, 507 (2014) (citation and quotation marks omitted).

 The United States Supreme Court in Reed explained that

 Government regulation of speech is content based if a law
 applies to particular speech because of the topic discussed
 or the idea or message expressed. This commonsense
 meaning of the phrase “content based” requires a court to
 consider whether a regulation of speech “on its face” draws
 distinctions based on the message a speaker conveys.
 Some facial distinctions based on a message are obvious,
 defining regulated speech by a particular subject matter,
 and others are more subtle, defining regulated speech by
 its function or purpose. Both are distinctions drawn based
 on the message a speaker conveys, and, therefore, are
 subject to strict scrutiny.

 Our precedents have also recognized a separate and
 additional category of laws that, though facially content
 neutral, will be considered content-based regulations of
 speech: laws that cannot be justified without reference to
 the content of the regulated speech, or that were adopted
 by the government because of disagreement with the
 message the speech conveys. Those laws, like those that
 are content based on their face, must also satisfy strict
 scrutiny.

 -8-
 STATE V. MYLETT

 Opinion of the Court

Reed, __ U.S. at __, 192 L. Ed. 2d at 245 (citations and internal quotation marks

omitted). As the North Carolina Supreme Court held, “[t]his determination can find

support in the plain text of a statute, or the animating impulse behind it, or the lack

of any plausible explanation besides distaste for the subject matter or message.”

Bishop, 368 N.C. at 875, 787 S.E.2d at 819. “Because strict scrutiny applies either

when a law is content based on its face or when the purpose and justification for the

law are content based, a court must evaluate each question before it concludes that

the law is content neutral and thus subject to a lower level of scrutiny.” Reed, __ U.S.

at __, 192 L. Ed. 2d at 247.

 In the instant case, it is clear that the jury-harassment statute is content

neutral, both on its face and by its purpose and justification. Taking each in turn,

nothing on the face of the statute indicates the law applies to certain speech “because

of the topic discussed or the idea or message expressed.” Id. at __, 192 L. Ed. 2d at

245; see also Cahaly v. Larosa, 796 F.3d 399, 405 (4th Cir. 2015) (holding that South

Carolina’s anti-robocall statute was content-based on its face because it applied “to

calls with a consumer or political message but [did] not reach calls made for any other

purpose”). The statute here does not limit itself to any particular topic or idea.

Rather, it applies equally to any idea if the idea is expressed in a manner that

intimidates or threatens the specified jurors. The statute may also be justified

without reference to the content of the regulated speech because the statute focuses

 -9-
 STATE V. MYLETT

 Opinion of the Court

on the form or manner of the expression, not the ideas sought to be expressed. The

statute does not prohibit a defendant from engaging in expressing his dissatisfaction

with a jury or juror’s particular vote even directly to the jurors; instead, it prohibits

a defendant from expressing his or her message in a particular manner that threatens

or intimidates the jurors. Therefore, assuming the statute does implicate the First

Amendment, it amounts to a content-neutral restriction. The standard of scrutiny

required to withstand a constitutional challenge is intermediate scrutiny.

 D. The Statute Survives Intermediate Scrutiny

 As discussed above, intermediate scrutiny requires that the statute in question

be “narrowly tailored to serve a significant governmental interest.” Ward v. Rock

Against Racism, 491 U.S. 781, 796, 798, 105 L. Ed. 2d 661, 678, 680 (1989) (internal

quotation marks omitted) (reaffirming that “a regulation of the time, place, or manner

of protected speech must be narrowly tailored to serve the government’s legitimate,

content-neutral interests but that it need not be the least restrictive or least intrusive

means of doing so”). The United States Supreme Court explained in Ward that “the

requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a

substantial government interest that would be achieved less effectively absent the

regulation.” Id. at 799, 105 L. Ed. 2d at 680 (citation and internal quotation marks

omitted). The Court went on to note that “[s]o long as the means chosen are not

substantially broader than necessary to achieve the government’s interest, however,

 - 10 -
 STATE V. MYLETT

 Opinion of the Court

the regulation will not be invalid simply because a court concludes that the

government’s interest could be adequately served by some less-speech-restrictive

alternative.” Id. at 800, 105 L. Ed. 2d at 681.

 It is undeniable that the State has a substantial interest in protecting the

sanctity of the constitutional right to a trial by jury through ensuring that jurors

remain free from threats and intimidation directly resulting from their duty to serve.

The statute’s proscriptions apply only to the manner in which a defendant seeks to

express their message—i.e., the statute prohibits a defendant from engaging in

expression only in so far as it intimidates or threatens those jurors specified under

the statute. Nothing in the statute, or its application to defendant, suggests the

regulation results in “a substantial portion of the burden on speech . . . not serv[ing]

to advance [the statute’s] goals.” Id. at 799, 105 L. Ed. 2d at 681. Accordingly, even

assuming N.C. Gen. Stat. § 14-225.2(a)(2) implicates the First Amendment, the

statute is narrowly tailored to serve the significant governmental interest of ensuring

that jurors remain free from threats and intimidation. We therefore reject

Defendant’s arguments.

 E. Void for Vagueness

 Defendant next argues that the term “intimidate” renders N.C. Gen. Stat. §

14-225.2(a)(2) void for vagueness because the statute “fails to provide . . . sufficient

notice as to what constitutes intimidation [and] leaves open whether Defendant

 - 11 -
 STATE V. MYLETT

 Opinion of the Court

intentionally intimidated the juror, or merely whether a juror felt intimidated.” We

disagree.

 A statute is unconstitutionally vague if it either “forbids or requires the doing

of an act in terms so vague that men of common intelligence must necessarily guess

at its meaning and differ as to its application . . . .” In re Burrus, 275 N.C. 517, 531,

169 S.E.2d 879, 888 (1969) (citation and quotation marks omitted), aff’d sub nom.,

McKeiver v. Pennsylvania, 403 U.S. 528, 29 L. Ed. 2d 647 (1971). Yet, the

Constitution does not impose “impossible standards of statutory clarity[.]” Id. So

long as the statute provides fair notice of “the conduct it condemns and prescribes

boundaries sufficiently distinct for judges and juries to interpret and administer it

uniformly,” constitutional requirements are satisfied. Id.

 This Court has previously held that the word “intimidate” is not

unconstitutionally vague. See State v. Hines, 122 N.C. App. 545, 552, 471 S.E.2d 109,

114 (1996), disc. review improvidently allowed, 345 N.C. 627, 481 S.E.2d 85 (1997).

In Hines, we upheld the constitutionality of N.C. Gen. Stat. § 163-275(11), which

makes it unlawful “to intimidate or attempt to intimidate” election officers in the

discharge of their official duties. 122 N.C. App. at 552, 471 S.E.2d at 114. As here,

that statute failed to define “intimidate.” Id. However, this Court applied the well-

established principle of statutory construction that undefined terms “should be given

their plain meaning if it is reasonable to do so[,]” and defined “intimidate” as is

 - 12 -
 STATE V. MYLETT

 Opinion of the Court

“commonly defined as ‘to make timid or fearful: inspire or affect with fear: frighten.’

” Id. (quoting Websters Third New International Dictionary (1968)). Thus, this Court

concluded that by enacting N.C. Gen. Stat. § 163-275(11), “the legislature intended

to prohibit anyone from frightening an individual while conducting election duties.”

Id.

 Here, as in Hines, “the statute is specific enough to warn individuals of

common intelligence of the conduct which is proscribed and is certainly capable of

uniform judicial interpretation.” Id. Therefore, we conclude that the undefined term

“intimidate” does not render N.C. Gen. Stat. § 14-225.2(a)(2) void for vagueness and

overrule Defendant’s constitutional challenges.

 III. Sufficiency of the Evidence

 Defendant next argues that the trial court erred by denying his motion to

dismiss the conspiracy charge because the State presented insufficient evidence that

defendant, Dan, and Kathryn reached “a meeting of the minds or an agreement to

intimidate the jury.” We disagree.

 In reviewing a criminal defendant’s motion to dismiss, the question for the trial

court “is whether there is substantial evidence (1) of each essential element of the

offense charged, or of a lesser offense included therein, and (2) of defendant’s being

the perpetrator of such offense. If so, the motion is properly denied.” State v. Fritsch,

351 N.C. 373, 378, 526 S.E.2d 451, 455 (citation omitted), cert. denied, 531 U.S. 890,

 - 13 -
 STATE V. MYLETT

 Opinion of the Court

148 L. Ed. 2d 150 (2000). “Substantial evidence is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.” State v. Smith,

300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). “[T]he trial court must consider all

evidence admitted, whether competent or incompetent, in the light most favorable to

the State, giving the State the benefit of every reasonable inference and resolving any

contradictions in its favor.” State v. Rose, 339 N.C. 172, 192, 451 S.E.2d 211, 223

(1994), cert. denied, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995).

 “The test for sufficiency of the evidence is the same whether the evidence is

direct or circumstantial or both.” Fritsch, 351 N.C. at 379, 526 S.E.2d at 455.

 If the evidence presented is circumstantial, the court must
 consider whether a reasonable inference of defendant’s
 guilt may be drawn from the circumstances. Once the court
 decides that a reasonable inference of defendant’s guilt
 may be drawn from the circumstances, then it is for the
 jury to decide whether the facts, taken singly or in
 combination, satisfy [it] beyond a reasonable doubt that the
 defendant is actually guilty.

Id. (citation and quotation marks omitted). We review the trial court’s denial of a

criminal defendant’s motion to dismiss de novo. State v. Smith, 186 N.C. App. 57, 62,

650 S.E.2d 29, 33 (2007).

 “A criminal conspiracy is an agreement between two or more people to do an

unlawful act or to do a lawful act in an unlawful manner.” State v. Winkler, 368 N.C.

572, 575, 780 S.E.2d 824, 826-27 (2015) (citation and quotation marks omitted).

Conspiracy may be proven through direct or circumstantial evidence. State v.

 - 14 -
 STATE V. MYLETT

 Opinion of the Court

Lawrence, 352 N.C. 1, 25, 530 S.E.2d 807, 822 (2000), cert. denied, 531 U.S. 1083, 148

L. Ed. 2d 684 (2001). The offense is generally “established by a number of indefinite

acts, each of which, standing alone, might have little weight, but taken collectively,

they point unerringly to the existence of a conspiracy.” Id. (citation and quotation

marks omitted).

 “In order to prove conspiracy, the State need not prove an express agreement;

evidence tending to show a mutual, implied understanding will suffice.” Winkler, 368

N.C. at 575, 780 S.E.2d at 827 (citation and quotation marks omitted). “Nor is it

necessary that the unlawful act be completed.” State v. Morgan, 329 N.C. 654, 658,

406 S.E.2d 833, 835 (1991). “Indeed, the conspiracy is the crime and not its

execution.” State v. Whiteside, 204 N.C. 710, 712, 169 S.E. 711, 712 (1933) (emphasis

added). Consequently, “no overt act is necessary to complete the crime of conspiracy.”

State v. Gibbs, 335 N.C. 1, 47, 436 S.E.2d 321, 347 (1993) (citation omitted). Rather,

the offense

 is complete upon “a meeting of the minds,” when the
 parties to the conspiracy (1) give sufficient thought to the
 matter, however briefly or even impulsively, to be able
 mentally to appreciate or articulate the object of the
 conspiracy, the objective to be achieved or the act to be
 committed, and (2) whether informed by words or by
 gesture, understand that another person also achieves that
 conceptualization and agrees to cooperate in the
 achievement of that objective or the commission of the act.

 - 15 -
 STATE V. MYLETT

 Opinion of the Court

State v. Sanders, 208 N.C. App. 142, 146, 701 S.E.2d 380, 383 (2010) (citations

omitted). “Once a conspiracy has been shown to exist, the acts of a co-conspirator

done in furtherance of a common, illegal design are admissible in evidence against

all.” Morgan, 329 N.C. at 658, 406 S.E.2d at 835.

 In the instant case, the State presented substantial evidence that defendant,

Dan, and Kathryn shared a “mutual, implied understanding” to commit juror

harassment. Winkler, 368 N.C. at 575, 780 S.E.2d at 827 (citation and quotation

marks omitted). During the sentencing hearing, defendant tensely paced in the

hallway outside the courtroom. Defendant confronted each of the six remaining

jurors about the verdict as they exited the courtroom after sentencing. More

importantly, defendant’s voice grew louder, and his tone more “threatening,” as he

became increasingly agitated with each confrontation.

 Dan and Kathryn mirrored defendant’s behavior when they joined him in the

hallway. According to juror Kinney Baughman’s testimony, when he exited the

courtroom, “the whole Mylett family . . . w[as] out there pacing, obviously upset[.]”

After Baughman retrieved his belongings from the jury room, defendant

“immediately engaged” him. Defendant told Baughman that he “had done wrong,

that his brother was an innocent man[.]” Baughman attempted to walk away from

the group, but quickly realized that he was walking in the wrong direction. When

Baughman turned around, Kathryn “immediately . . . pounced” on him, “pointing

 - 16 -
 STATE V. MYLETT

 Opinion of the Court

fingers” in Baughman’s face while “screaming and yelling” similar accusations to

those made by defendant.

 “Ordinarily, the existence of a conspiracy is a jury question, and where

reasonable minds could conclude that a meeting of the minds exists, the trial court

does not err in denying a motion to dismiss for insufficiency of the evidence.” Sanders,

208 N.C. App. at 146, 701 S.E.2d at 383 (citation and quotation marks omitted). The

parallel behavior exhibited by defendant, Dan, and Kathryn as they confronted the

jurors is evidence that the parties mutually understood “the objective to be achieved”

and implicitly agreed “to cooperate in the achievement of that objective or the

commission of the act.” Id. This evidence was sufficient to send the conspiracy charge

to the jury.

 Defendant also contends that the State presented insufficient evidence that he

intended “to threaten or menace any juror.” However, this argument challenges the

denial of his motion to dismiss the charges of juror harassment, not conspiracy to

commit that offense. As explained above, the law distinguishes “between the offense

to be committed and the conspiracy to commit the offense.” Whiteside, 204 N.C. at

712, 169 S.E. at 712 (emphasis added). Since the jury found defendant not guilty of

all six counts of juror harassment, defendant is unable to show that, absent the

alleged error, “a different result would have been reached at trial . . . .” N.C. Gen.

Stat. § 15A-1443(a) (2017); see also State v. Stanley, 110 N.C. App. 87, 90, 429 S.E.2d

 - 17 -
 STATE V. MYLETT

 Opinion of the Court

349, 350 (1993) (declining to address the defendant’s challenge to the trial court’s

denial of his motion to dismiss where the “defendant was not convicted of first degree

murder or otherwise prejudiced by the court’s refusal to dismiss the charge”).

Therefore, defendant’s argument is moot, and we will not address it. See State v.

Marshall, 304 N.C. 167, 168-69, 282 S.E.2d 422, 423 (1981) (“Since the jury at th[e

sentencing] phase returned a verdict favorable to defendant, the questions which he

attempts to raise are moot and will not be decided.”).

 IV. Evidentiary Challenges

 Defendant next asserts several challenges to the trial court’s evidentiary

rulings. Specifically, he argues that the trial court erroneously (1) excluded a

Facebook post proffered by defendant to impeach a juror-witness and (2) admitted

the juror-witnesses’ testimony about the fraternity party fight underlying Dan’s trial,

while excluding defendant’s testimony about the same issue. We disagree.

 A. Standard of Review

 As a general rule, “[e]videntiary errors are harmless unless a defendant proves

that absent the error a different result would have been reached at trial.” State v.

Ferguson, 145 N.C. App. 302, 307, 549 S.E.2d 889, 893, disc. review denied, 354 N.C.

223, 554 S.E.2d 650 (2001). However, “[w]hen preserved by an objection, a trial

court’s decision with regard to the admission of evidence alleged to be hearsay is

 - 18 -
 STATE V. MYLETT

 Opinion of the Court

reviewed de novo.” State v. Johnson, 209 N.C. App. 682, 692, 706 S.E.2d 790, 797

(2011).

 B. Facebook Post

 During cross-examination, defendant attempted to introduce juror Kinney

Baughman’s Facebook post from 2 April 2016, in which Baughman shared an

OpenCulture.com post describing a technique for opening a wine bottle with a shoe.

Defendant proffered this evidence to impeach Baughman’s testimony about his

emotional distress resulting from the confrontation following Dan’s trial. However,

the State objected on the grounds that defendant failed to disclose it during pretrial

discovery, as required by N.C. Gen. Stat. § 15A-905(a), and the trial court excluded

the post.

 N.C. Gen. Stat. § 15A-905 governs a criminal defendant’s pretrial discovery

obligations in superior court proceedings. Upon the State’s motion, the trial court

must

 order the defendant to permit the State to inspect and copy
 or photograph books, papers, documents, photographs,
 motion pictures, mechanical or electronic recordings,
 tangible objects, or copies or portions thereof which are
 within the possession, custody, or control of the defendant
 and which the defendant intends to introduce in evidence
 at the trial.

N.C. Gen. Stat. § 15A-905(a) (2017).

 - 19 -
 STATE V. MYLETT

 Opinion of the Court

 On appeal, defendant contends that the trial court erroneously excluded

Baughman’s Facebook post because N.C. Gen. Stat. § 15A-905(a) does not apply to

impeachment evidence. Defendant offers no case law supporting this argument, and

our research yields none. However, even assuming, arguendo, that the trial court

erred by excluding this evidence, defendant fails to explain how “absent the error a

different result would have been reached at trial.” Ferguson, 145 N.C. App. at 307,

549 S.E.2d at 893. Since defendant fails to meet his burden of showing prejudice, this

argument is overruled.

 C. Fraternity-Party Fight

 Defendant next argues that the trial court erred by permitting the juror-

witnesses to testify, over objection, about the fraternity-party fight underlying Dan’s

trial, while excluding defendant’s testimony about the same events. Specifically,

defendant contends that the jurors’ testimony was improper character evidence and

inadmissible hearsay. We disagree.

 N.C. Gen. Stat. § 8C-1, Rule 404(b) is a “general rule of inclusion of relevant

evidence of other crimes, wrongs or acts by a defendant subject to but one exception[.]”

State v. Coffey, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Under Rule 404(b),

such evidence must be excluded “if its only probative value is to show that the

defendant has the propensity or disposition to commit an offense of the nature of the

crime charged.” Id.

 - 20 -
 STATE V. MYLETT

 Opinion of the Court

 Contrary to defendant’s arguments at trial and on appeal, evidence of the

fraternity-party fight was not introduced for any improper purpose under Rule

404(b). As the trial court recognized in ruling on defendant’s motion in limine, it

would have been nearly impossible to exclude all evidence of the fight underlying

Dan’s trial. Indeed, this precipitating event “forms part of the history” of defendant’s

interaction with the juror-witnesses. State v. Agee, 326 N.C. 542, 547, 391 S.E.2d

171, 174 (1990) (citation and quotation marks omitted).

 Similarly, the jurors’ testimony on this issue was not hearsay. “Hearsay” is “a

statement, other than one made by the declarant while testifying at the trial or

hearing, offered in evidence to prove the truth of the matter asserted.” N.C. Gen.

Stat. § 8C-1, Rule 801(c). To the limited extent that the jurors even testified about

the fight, they did not recount out-of-court statements from Dan’s trial, nor was the

evidence offered to prove the truth of the matter asserted. Instead, the testimony

was offered for the legitimate, non-hearsay purpose of proving the jurors’ states of

mind:

 [THE STATE]: And what did you hear or see [defendant]
 do?

 [ROSE NELSON]: Well, he asked me what if—or he said
 that he hoped that I could live with myself because I had
 convicted an innocent man, and then as I was making my
 way to the stairs trying to get down the stairs, he was
 saying something about the crooked Boone police, and he
 hoped that I slept well.

 - 21 -
 STATE V. MYLETT

 Opinion of the Court

Q. How would you describe the tone of voice he used?

A. To me it was very threatening.

Q. Why do you say that?

A. I guess because of being in the courtroom for the
 days that I was in the courtroom and listening to
 what the two young men had done prior to that.

 ...

Q. And you mentioned—what are you referring to when
 you say what you heard the two young men do prior
 to that?

A. I just felt like there was a lot of violence displayed
 and the whole reason that they were at, you know,
 in the situation that they were in and their whole
 demeanor during the whole trial.

Q. How would you describe [defendant]’s demeanor
 during the trial?

A. Very agitated.

 ...

Q. After these comments were made to you did you
 have any sort of physical reaction to it?

A. I did. I left the courtroom, went straight to my
 husband’s work and I was literally shaking, cause I
 was nervous. I had never done that before and the
 fact of the matter that the gentlemen knew what I
 was driving, where I worked and just very—it just
 was unnerving to me to know that they had that
 kind of anger in them and that they could possibly
 retaliate towards me.

 - 22 -
 STATE V. MYLETT

 Opinion of the Court

 Defendant contends that the trial court denied him an opportunity to testify

about the fight and thus to rebut the implication that he committed an act of violence.

However, unlike the jurors’ testimony, the evidence that defendant sought to

introduce was inadmissible hearsay:

 [DEFENSE COUNSEL]: How were you feeling
 emotionally?

 [DEFENDANT:] I was distraught, I was confused, I was
 sad, upset, just a overwhelming waterfall of different
 emotions just taking over.

 Q. Can you tell us why you felt that way?

 A. I was shocked with the outcome because they had
 admitted he was spitting out blood and the officer
 admitted he didn’t try to spit on him but I guess—

 [THE STATE]: Objection.

 THE COURT: Sustained.

(Emphasis added).

 Unlike the jurors’ testimony, defendant’s statement that “the officer admitted

he didn’t try to spit on him” is inadmissible hearsay. See N.C. Gen. Stat. § 8C-1, Rule

801(c). In his brief, defendant explains that he offered this evidence “to rebut the

allegations and show that he and his brother were victims”—i.e. to prove the truth of

the matter asserted. Accordingly, unlike the juror-witnesses’ testimony on the

matter, defendant’s testimony regarding the fight was inadmissible hearsay.

Therefore, the trial court properly admitted the former and excluded the latter.

 - 23 -
 STATE V. MYLETT

 Opinion of the Court

 V. Jury Instructions

 Defendant’s final argument is that the trial court erred by denying his request

for a jury instruction on the definition of “intimidate.” We disagree.

 It is the duty of the trial court “to instruct the jury on the law arising on the

evidence. This includes instruction on the elements of the crime.” State v. Bogle, 324

N.C. 190, 195, 376 S.E.2d 745, 748 (1989). “Failure to instruct upon all substantive

or material features of the crime charged is error.” Id. However, “[i]t is not error for

the court to fail to define and explain words of common usage and meaning to the

general public.” S. Ry. Co. v. Jeffco Fibres, Inc., 41 N.C. App. 694, 700, 255 S.E.2d

749, 753, disc. review denied, 298 N.C. 299, 259 S.E.2d 302 (1979).

 Since there is no specific pattern jury instruction for N.C. Gen. Stat. § 14-

225.2(a)(2), the State submitted a proposed special jury instruction. At the charge

conference, defendant contended that the State’s proposed instruction was “vague”

and would therefore “make it tough for the jury” unless the trial court also provided

a definition of the term “intimidate.” Defendant submitted two proposed definitions,

which would have required the State to prove either: (1) that the defendant means to

communicate a serious expression of an intent to commit an act of unlawful violence

to a particular individual or group of individuals; or (2) that the defendant menaced

and made coercive statements to the juror, or otherwise threatened in an especially

malignant or hostile manner, and that he intended to do so. The State opposed

 - 24 -
 STATE V. MYLETT

 Opinion of the Court

defendant’s proposed definitions as unnecessary and contrary to law, and the trial

court denied his request.

 Defendant contends that the trial court’s failure to provide a “legally sufficient”

definition of “intimidate” likely confused the jury. However, as explained above,

“intimidate” is a word of common usage that may be reasonably construed according

to its plain meaning. Hines, 122 N.C. App. at 552, 471 S.E.2d at 114 (“Undefined

words in a statute should be given their plain meaning if it is reasonable to do so.”).

Since “intimidate” has a common meaning amongst the general public, the trial court

was not required to define the term for the jury. See S. Ry. Co., 41 N.C. App. at 700,

255 S.E.2d at 753-54 (determining that “by reason of,” “arising out of,” and “incidental

to” are “phrases of common usage” that required no “specific definition and

explanation” where “the meaning of the terms as were used in the jury instructions

was clear and should have been understood by the jury”); State v. Geer, 23 N.C. App.

694, 696, 209 S.E.2d 501, 503 (1974) (concluding that the trial court did not err by

failing to define “flight” in its instructions to the jury, where the word “was being used

in its common, everyday sense”).

 VI. Conclusion

 N.C. Gen. Stat. § 14-225.2(a)(2) prohibits nonexpressive conduct, unprotected

speech. The statute provides fair notice of the conduct it condemns—threatening or

intimidating former jurors as a result of their service—and does not allow for

 - 25 -
 STATE V. MYLETT

 Opinion of the Court

arbitrary enforcement. Accordingly, N.C. Gen. Stat. § 14-225.2(a)(2) is neither

unconstitutionally overbroad nor void for vagueness. Furthermore, the State

presented sufficient evidence from which a reasonable juror could conclude that

defendant, Dan, and Kathryn conspired to commit juror harassment. Therefore, the

trial court did not err by denying defendant’s motions to dismiss.

 Even if the trial court erred in excluding the Facebook post proffered to

impeach a juror-witness, defendant fails to establish prejudice. The jurors’ testimony

regarding the fraternity-party fight was neither improper character evidence nor

inadmissible hearsay, while defendant’s testimony on the matter was properly

excluded as hearsay. Finally, the trial court did not err by failing to define

“intimidate” for the jury because the term is one of common usage and meaning.

 NO ERROR.

 Judge ZACHARY concurs.

 Chief Judge McGEE dissents by separate opinion.

 - 26 -
 No. COA17-480 – State v. Mylett

 McGEE, Chief Judge, dissenting.

 I. First Amendment1

 I believe N.C. Gen. Stat. § 14-225.2(a)(2) (2017) (“N.C.G.S. § 14-225.2(a)(2)” or

“the statute”) is unconstitutional on its face and as applied to Defendant. The

relevant language of the statute states: “A person is guilty of harassment of a juror if

he: . . . . As a result of the prior official action of another as a juror in a grand jury

proceeding or trial, threatens in any manner or in any place, or intimidates the former

juror or his spouse.” N.C.G.S. § 14-225.2(a)(2). For simplicity, I will refer to “former

jurors” as referenced in N.C.G.S. § 14-225.2(a)(2) as “jurors.”

 As the majority opinion recognizes, when considering a First Amendment

challenge, “[w]e must first determine whether [the challenged statute] restricts

protected speech or expressive conduct, or whether the statute affects only

nonexpressive conduct. Answering this question determines whether the First

Amendment is implicated.” State v. Bishop, 368 N.C. 869, 872, 787 S.E.2d 814, 817

(2016).2

 A. Is the First Amendment Implicated

 1 Much of the analysis in earlier sections of my dissent will also be relevant to later sections.
 2 In line with the majority opinion, I will also use “speech” or “protected speech” to refer to both
“protected speech” and “expressive conduct.” In addition, although Defendant was only convicted on
the conspiracy charge, because his intent to violate N.C.G.S. § 14-225.2(a)(2) is an element of that
charge, it is appropriate to consider the constitutionality of the statute as argued by Defendant.
 STATE V. MYLETT

 McGEE, C.J., dissenting

 I first note that, though the State may have argued this “threshold” issue at

trial, on appeal the State seems to concede that the statute does implicate the First

Amendment, as it does not argue this issue in its brief—its arguments are limited to

contentions that the statute survives First Amendment analysis pursuant to either

intermediate scrutiny or strict scrutiny. I disagree with the majority opinion’s

holding that “[w]hen read in context, it is apparent [the statute’s language] applies

to a defendant’s conduct—threats and intimidation—directed at a particular class of

persons—jurors—irrespective of the content[,]” and “not speech.” (Emphasis added).

It is, in part, precisely because the statute proscribes conduct “irrespective of the

content” of that conduct that it implicates the First Amendment. “‘A law directed at

the communicative nature of conduct must, like a law directed at speech itself, be

justified by the substantial showing of need that the First Amendment requires.’”

Texas v. Johnson, 491 U.S. 397, 406, 105 L. Ed. 2d 342, 355 (1989) (citation omitted).

“The right to free speech, of course, includes the right to attempt to persuade others

to change their views, and may not be curtailed simply because the speaker’s message

may be offensive to his audience.” Hill v. Colorado, 530 U.S. 703, 716, 147 L. Ed. 2d

597, 611 (2000).

 The fact that the express language of the relevant part of N.C.G.S. § 14-

225.2(a)(2) proscribes “threatening” or “intimidating” a juror is not sufficient to

support a holding that the statute does not implicate the First Amendment. The

 2
 STATE V. MYLETT

 McGEE, C.J., dissenting

United States Supreme Court in Cohen v. California, for example, held a California

statute that “prohibit[ed] ‘maliciously and willfully disturb[ing] the peace or quiet of

any neighborhood or person . . . by . . . offensive conduct’” violated the defendant’s

First Amendment rights. Cohen v. California, 403 U.S. 15, 16, 29 L. Ed. 2d 284, 288

(1971) (citation omitted). The express language of the statute in Cohen prohibited

“offensive conduct.” The express language of N.C.G.S. § 14-225.2(a)(2) prohibits

“threats” or “intimidation.” All three of these terms, on their face, can be defined as

“conduct.” However, the Court in Cohen held—despite the fact that the express

language of the California statute was limited to “conduct”—that statute in reality

restricted protected speech, because of the type of conduct that could be subject to

prosecution pursuant to its terms. The defendant in Cohen was convicted of

“disturbing the peace” through “offensive conduct” for wearing a jacket adorned with

the words “F_ck the Draft.” Id. at 16, 29 L. Ed. 2d at 288-89 (citation omitted). The

Court recognized that, according to longstanding precedent, certain kinds of speech

are not protected by the First Amendment because of the inherent dangers involved

when those kinds of speech are used. Id. at 19–20, 29 L. Ed. 2d at 290-91 (“[T]his

case cannot be said to fall within those relatively few categories of instances where

prior decisions have established the power of government to deal more

comprehensively with certain forms of individual expression simply upon a showing

that such a form was employed. This is not, for example, an obscenity case.” The

 3
 STATE V. MYLETT

 McGEE, C.J., dissenting

Court also held that the defendant’s conduct did not fall within the “fighting words”

exception to First Amendment protections.).

 The Court in Cohen held: “[The defendant’s] conviction . . . rests squarely upon

his exercise of the ‘freedom of speech’ protected from arbitrary governmental

interference by the Constitution and can be justified, if at all, only as a valid

regulation of the manner in which he exercised that freedom[.]” Id. at 19, 29 L. Ed.

2d at 290. Because the defendant’s alleged offensive conduct in Cohen was an act of

protected speech, it did not matter that some other type of conduct might constitute

“offensive conduct” that could be prosecuted without violating the First Amendment.

Id. at 26, 29 L. Ed. 2d at 294-95 (“[A]bsent a more particularized and compelling

reason for its actions, the State may not, consistently with the First and Fourteenth

Amendments, make the simple public display here involved of this single four-letter

expletive a criminal offense. Because that is the only arguably sustainable rationale

for the conviction here at issue, the judgment below must be reversed.”).

 In the present case, although the statute proscribes the following relevant

“conduct:” “threaten[ing] in any manner or in any place, or intimidat[ing] [a] former

juror” “[a]s a result of the prior official action of [the former] juror[,]” N.C.G.S. § 14-

225.2(a)(2), the only “sustainable rationale for the conviction” was Defendant’s

“speech”—his verbal communication of his opinion to the jurors that their verdict

constituted an injustice to his brother. The verdict of a jury convicting a defendant

 4
 STATE V. MYLETT

 McGEE, C.J., dissenting

is unquestionably as much an act of the State as the indictment of that defendant,

and a citizen’s right to publicly criticize a jury’s verdict is protected by the First

Amendment.

 Therefore, the conduct proscribed by N.C.G.S. § 14-225.2(a)(2) implicates

protected speech unless it is covered by some previously recognized exception to First

Amendment protections. Virginia v. Black, 538 U.S. 343, 358, 155 L. Ed. 2d 535, 551

(2003) (“The protections afforded by the First Amendment, however, are not absolute,

and we have long recognized that the government may regulate certain categories of

expression consistent with the Constitution. See, e.g., Chaplinsky v. New Hampshire,

315 U.S. 568, 571–572, 86 L. Ed. 1031 (1942) (‘There are certain well-defined and

narrowly limited classes of speech, the prevention and punishment of which has never

been thought to raise any Constitutional problem’).”). The previously recognized

exception most relevant to our analysis of N.C.G.S. § 14-225.2(a)(2) is the “true

threat” exception. See Id. at 359, 155 L. Ed.2d at 552 (citations omitted) (“the First

Amendment also permits a State to ban a ‘true threat’”).

 The Fifth Circuit recently held a statute that does not explicitly limit the term

“threat” to “true threats” cannot be construed in a manner that does not implicate the

First Amendment:

 [Section 14:122 of the] statute criminalizes “public
 intimidation,” defined as “the use of violence, force, or
 threats upon [a specified list of persons, including any
 public officer or public employee] with the intent to

 5
 STATE V. MYLETT

 McGEE, C.J., dissenting

influence his conduct in relation to his position,
employment, or duty.” (Emphasis added.) On its face, the
statute is extremely broad. The definition of “threat”
generally encompasses any “statement of an intention to
inflict pain, injury, damage, or other hostile action on
someone in retribution for something done or not done.”
That definition easily covers threats to call your lawyer if
the police unlawfully search your house or to complain to a
DMV manager if your paperwork is processed wrongly.

....

According to the state, we should construe the statute to
apply only to true threats, i.e. “a serious expression of an
intent to commit an act of unlawful violence” toward
specific persons. There are several reasons why we cannot
do so. First, the definition of “threat” is broader than true
threats: any “statement of an intention to inflict pain,
injury, damage, or other hostile action on someone in
retribution for something done or not done.” [(citing
“Oxford Dictionaries (Online ed.)”) (emphasis added by
Fifth Circuit).] . . . .

Finally, Louisiana’s reliance on its caselaw proves to be a
double-edged sword. As plaintiffs note, the Louisiana
Court of Appeals has upheld the conviction of a defendant
who violated Section 14:122 by threatening “to sue” an
officer and “get [his] job” if the officer arrested him.
Plainly, such a threat suggests no violence—indeed, the
threat appears to be a plan to take perfectly lawful actions.
Accordingly, we cannot construe Section 14:122 to apply
only to true threats of violence.

It follows that, properly understood, Section 14:122 applies
to any threat meant to influence a public official or
employee, in the course of his duties, to obtain something
the speaker is not entitled to as a matter of right. But so
construed, the statute reaches both true threats—such as
“don’t arrest me or I’ll hit you”—and threats to take wholly
lawful actions—such as “don’t arrest me or I’ll sue you.” In

 6
 STATE V. MYLETT

 McGEE, C.J., dissenting

 both those examples, the speaker may be legally subject to
 arrest and is trying to influence a police officer in the
 course of his duties. Thus, Section 14:122 makes both
 threats a criminal act.

Seals v. McBee, 898 F.3d 587, 593–95 (5th Cir. 2018) (citations and footnotes omitted).

 Our Supreme Court in Bishop implicitly recognized the necessity, as held in

Seals, that any definition of “intimidate” in the criminal stature before it would have

to rise to the level of a “true threat” in order to survive First Amendment analysis.

The Court rejected the State’s argument that, in order to render the statute involved

constitutional, the Court itself should “define ‘to intimidate’ as ‘to make timid; fill

with fear[,]’” because “intimidate” had not been defined by statute or case law for that

specific statute. The Court reasoned:

 While we need not, and do not, address a hypothetical
 statute limited to proscribing unprotected “true threats”—
 which the United States Supreme Court has defined as
 “those statements where the speaker means to
 communicate a serious expression of an intent to commit
 an act of unlawful violence to a particular individual or
 group of individuals”—we do note that such a statute might
 present a closer constitutional question. Cf. Elonis v.
 United States, (“reversing the defendant’s conviction under
 a federal statute that made ‘it a crime to transmit in
 interstate commerce “any communication containing any
 threat . . . to injure the person of another”’ and for that
 reason, seeing no need to consider related First
 Amendment concerns”).

Bishop, 368 N.C. at 878 n.3, 787 S.E.2d at 821 n.3 (citations omitted) (emphasis

added). N.C.G.S. § 14-225.2(a)(2) suffers from this same constitutional deficiency.

 7
 STATE V. MYLETT

 McGEE, C.J., dissenting

 N.C.G.S. § 14-225.2(a)(2) fails to define its key terms. Neither “threaten” nor

“intimidate” is defined and, absent any clear definition of these terms by the General

Assembly, or our appellate courts, we cannot construe the statute in a manner that

prohibits only “true threats.” The trial court’s refusal, in the present case, to include

in its jury instruction a definition of “intimidate” as limited to a “true threat,”

consistent with Bishop and Black, demonstrates this deficiency in the statute. In

Bishop, concerning the relevant statute in that case, the Court stated why clear

definitions are a requirement:

 Regarding motive, the statute prohibits anyone from
 posting forbidden content with the intent to “intimidate or
 torment” a minor. However, neither “intimidate” nor
 “torment” is defined in the statute, and the State itself
 contends that we should define “torment” broadly to
 reference conduct intended “to annoy, pester, or harass.”
 The protection of minors’ mental well-being may be a
 compelling governmental interest, but it is hardly clear
 that teenagers require protection via the criminal law from
 online annoyance.

Bishop, 368 N.C. at 878–79, 787 S.E.2d at 821 (emphasis added). The Court further

underscored the necessity, for First Amendment purposes, of limiting terms such as

“intimidate” to acts constituting “true threats.” Id. at 878 n.3, 787 S.E.2d at 821 n.3.

(had “intimidate” been defined in the relevant statute as limited to “true threats,”

“such a statute might [have] present[ed] a closer constitutional question”).

 Because the majority opinion holds that the statute only proscribes non-

expressive conduct, it does not see any need to define “threaten” or “intimidate” in a

 8
 STATE V. MYLETT

 McGEE, C.J., dissenting

manner that restricts those terms to actions that constitute “true threats.” Because

the State implicitly concedes that the statute implicates First Amendment

protections, it—unlike in Bishop—does not even suggest any appropriate definitions

for those terms.3 Undefined, “threaten” and “intimidate” encompass a multitude of

activities that do not constitute “true threats;” those that “communicate a serious

expression of an intent to commit an act of unlawful violence to a particular

individual or group of individuals.” Black, 538 U.S. at 359, 155 L. Ed. 2d at 552;

Bishop, 368 N.C. at 878 n.3, 787 S.E.2d at 821 n.3. Instead, the majority opinion’s

holding will allow prosecution for protesting government action based on jurors’

claims that a defendant’s actions made them feel “timid or fearful.” State v. Hines,

122 N.C. App. 545, 552, 471 S.E.2d 109, 114 (1996) (citation omitted). As the United

States Supreme Court has declared:

 [A] function of free speech under our system of government
 is to invite dispute. It may indeed best serve its high
 purpose when it induces a condition of unrest, creates

 3 The State does make one argument that the statute does not implicate the First Amendment,
but solely based upon its contention that “the inside of a courthouse is a nonpublic forum, where the
government has wide latitude to enforce reasonable speech restrictions.” This argument fails: “[The
defendant] was tried under a statute applicable throughout the entire State. Any attempt to support
this conviction on the ground that the statute seeks to preserve an appropriately decorous atmosphere
in the courthouse where [the defendant] was arrested must fail in the absence of any language in the
statute that would have put appellant on notice that certain kinds of otherwise permissible speech or
conduct would nevertheless, under California law, not be tolerated in certain places.” Cohen, 403 U.S.
at 19, 29 L. Ed. 2d at 290 (citations omitted). N.C.G.S. § 14-225.2(a)(2) proscribes the “threatening”
or “intimidating” conduct “in any manner or in any place,” not just in courthouses. Id. (emphasis
added). For example, nothing in the statute would have prevented Defendant from prosecution, based
upon the identical conduct alleged in this case, if it had occurred in a public square or other location
where “the government’s ability to restrict speech is ‘very limited.’” McCullen v. Coakley, 573 U.S. __,
__, 189 L. Ed. 2d 502, 514 (2014); see also Packingham v. North Carolina, 582 U.S. __, 198 L. Ed. 2d
273 (2017).

 9
 STATE V. MYLETT

 McGEE, C.J., dissenting

 dissatisfaction with conditions as they are, or even stirs
 people to anger. Speech is often provocative and
 challenging. It may strike at prejudices and
 preconceptions and have profound unsettling effects as it
 presses for acceptance of an idea. That is why freedom of
 speech, though not absolute, is nevertheless protected
 against censorship or punishment, unless shown likely to
 produce a clear and present danger of a serious substantive
 evil that rises far above public inconvenience, annoyance, or
 unrest. There is no room under our Constitution for a more
 restrictive view.

Terminiello v. City of Chicago, 337 U.S. 1, 4, 93 L. Ed. 1131, 1134-35 (1949) (citations

omitted). In order to be properly excluded from First Amendment protections, the

definitions of “threaten” and “intimidate” must not fall below the “true threat”

standard set forth by the United States Supreme Court:

 [T]he First Amendment . . . permits a State to ban a “true
 threat.” Watts v. United States, 394 U.S. 705, 708 (1969);
 accord, R.A.V. v. City of St. Paul, [505 U.S. 377,] 388,
 (“[T]hreats of violence are outside the First Amendment”);
 Madsen v. Women’s Health Center, Inc., 512 U.S. 753, 774
 (1994); Schenck v. Pro–Choice Network of Western N.Y., 519
 U.S. 357, 373 (1997).

 “True threats” encompass those statements where the
 speaker means to communicate a serious expression of an
 intent to commit an act of unlawful violence to a particular
 individual or group of individuals. See Watts v. United
 States, supra, at 708 (“political hyperbole” is not a true
 threat); R.A.V. v. City of St. Paul, 505 U.S., at 388. . . . .
 [A] prohibition on true threats “protect[s] individuals from
 the fear of violence” and “from the disruption that fear
 engenders,” in addition to protecting people “from the
 possibility that the threatened violence will occur.”
 Intimidation in the constitutionally proscribable sense of
 the word is a type of true threat, where a speaker directs a

 10
 STATE V. MYLETT

 McGEE, C.J., dissenting

 threat to a person or group of persons with the intent of
 placing the victim in fear of bodily harm or death.

Black, 538 U.S. at 359-60, 155 L. Ed. 2d at 552 (citations omitted) (emphasis added);

see also Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life

Activists, 290 F.3d 1058, 1062 (9th Cir. 2002) (properly construing the relevant

federal statute in the defendants’ appeal “requires that we define ‘threat of force’ in

a way that comports with the First Amendment [i.e. as a ‘true threat’], and it raises

the question whether the conduct that occurred here falls within the category of

unprotected speech”). Precedent from the United States Supreme Court, cited with

favor by our Supreme Court, makes clear that full First Amendment protections

apply to statutes like N.C.G.S. § 14-225.2(a)(2) unless the relevant terms, such as

“threaten” or “intimidate,” have been defined as limited to “true threats.” Black, 538

U.S. at 359-60, 155 L. Ed. 2d at 552; Bishop, 368 N.C. at 878–79, 787 S.E.2d at 820–

21. Because the majority opinion does not require that the N.C.G.S. § 14-225.2(a)(2)

terms “threaten” and “intimidate” be limited to “true threats” as defined by our

Supreme Court and the United States Supreme Court, I would hold that the First

Amendment is implicated.

 B. First Amendment Analysis

 1. Content Based or Content Neutral

 Having concluded that the First Amendment is implicated, I conduct further

First Amendment review. “[T]he First Amendment, subject only to narrow and well-

 11
 STATE V. MYLETT

 McGEE, C.J., dissenting

understood exceptions, does not countenance governmental control over the content

of messages expressed by private individuals.” Turner Broad. Sys., Inc. v. F.C.C., 512

U.S. 622, 641, 129 L. Ed. 2d 497, 516-17 (1994) (citations omitted). As noted by our

Supreme Court, the correct level of scrutiny depends on the nature of the speech

proscribed:

 Having concluded that [the statute at issue] limits speech,
 we now consider a second threshold inquiry: whether this
 portion of the [relevant] statute is content based or content
 neutral. This central inquiry determines the level of
 scrutiny we apply here. Content based speech regulations
 must satisfy strict scrutiny. Such restrictions “are
 presumptively unconstitutional and may be justified only
 if the government proves that they are narrowly tailored to
 serve compelling state interests.” In contrast, content
 neutral measures—such as those governing only the time,
 manner, or place of First Amendment-protected
 expression—are subjected to a less demanding but still
 rigorous form of intermediate scrutiny. The government
 must prove that they are “narrowly tailored to serve a
 significant governmental interest, and that they leave open
 ample alternative channels for communication of the
 information.”

Bishop, 368 N.C. at 874–75, 787 S.E.2d at 818 (citations omitted). I would hold the

statute is content based and, therefore, apply strict scrutiny. In the alternative, I

would also hold the statute, as written and interpreted, fails intermediate scrutiny.

 “A law that is content based on its face is subject to strict scrutiny regardless

of the government’s benign motive, content-neutral justification, or lack of ‘animus

toward the ideas contained’ in the regulated speech.” Reed v. Town of Gilbert, Ariz.,

 12
 STATE V. MYLETT

 McGEE, C.J., dissenting

__ U.S. __, __, 192 L. Ed. 2d 236, 245 (2015); see also Bishop, 368 N.C. at 875–76, 787

S.E.2d at 819 (“strict scrutiny applies either when a law is content based on its face

or when the purpose and justification for the law are content based”).

 N.C.G.S. § 14-225.2(a)(2) states: “A person is guilty of harassment of a juror if

he: . . . . As a result of the prior official action of another as a juror in a grand jury

proceeding or trial, threatens in any manner or in any place, or intimidates the former

juror or his spouse.” N.C.G.S. § 14-225.2(a)(2) (emphasis added). On its face, the

statute criminalizes communication of any perceived threat to, or any form of

intimidation of, a juror, by any person, based upon that person’s reaction to a verdict,

an indictment, or any other official action taken by the juror. In simpler terms, as

long as some theory of threat or intimidation is alleged, the statute prohibits persons

from expressing their discontent in response to government action—specifically the

actions jurors perform for the State as required by N.C. Const. art. I, §§ 24-26 and

our General Statutes. The fact that the State action in a trial is accomplished in part

through our jury system does not diminish the governmental nature of that action.

 In Bishop, our Supreme Court held:

 Here, it is clear that the cyberbullying statute is content
 based, on its face and by its plain text, because the statute
 “defin[es] regulated speech by [its] particular subject
 matter.” The provision under which defendant was
 arrested and prosecuted prohibits “post[ing] or
 encourag[ing] others to post . . . private, personal, or sexual
 information pertaining to a minor.” The statute
 criminalizes some messages but not others, and makes it

 13
 STATE V. MYLETT

 McGEE, C.J., dissenting

 impossible to determine whether the accused has
 committed a crime without examining the content of his
 communication.

Bishop, 368 N.C. at 876, 787 S.E.2d at 819. In the present case, N.C.G.S. § 14-

225.2(a)(2) criminalizes some messages—dissatisfaction with the official acts of a

juror—but not others—dissatisfaction with a juror’s comments concerning the

verdict, for example. Therefore, it is “impossible to determine whether the accused

has [violated the statute] without examining the content of his communication.” Id.

In the present case, the State had to examine the content of Defendant’s

communications to the jurors in order to determine that those communications were

in response to an official act—voting to convict Defendant’s brother—and, also, in

order to conclude that the communications constituted “threats” or “intimidation.”

Had the State determined, based upon what Defendant allegedly said to the jurors,

that Defendant’s actions were solely in response to some non-official act—e.g. a

disparaging comment made by a juror concerning Defendant or his brother, no

violation of the statute would have occurred. Likewise, had the State determined

that, pursuant to the majority opinion’s interpretation of the statute, Defendant’s

comments to the jurors could not have caused the jurors to feel “frightened” or “timid,”

it could not have charged Defendant. I would hold that strict scrutiny should apply.

Id.

 2. The Statute Fails Both Strict Scrutiny and Intermediate Scrutiny

 14
 STATE V. MYLETT

 McGEE, C.J., dissenting

 However, I would also hold that the statute, as written and interpreted, fails

even intermediate scrutiny and, therefore, violates the First Amendment.

“Articulations of intermediate scrutiny vary depending on context, but tend to require

an important or substantial government interest, a direct relationship between the

regulation and the interest, and regulation no more restrictive than necessary to

achieve that interest.” Hest Techs., Inc. v. State ex rel. Perdue, 366 N.C. 289, 298, 749

S.E.2d 429, 436 (2012) (citation omitted). In order to survive intermediate scrutiny

review, “[t]he government must prove that [the restrictions on speech] are ‘narrowly

tailored to serve a significant governmental interest, and that they leave open ample

alternative channels for communication of the information.’” Bishop, 368 N.C. at

874–75, 787 S.E.2d at 818 (citation omitted). “A statute is narrowly tailored if it

targets and eliminates no more than the exact source of the ‘evil’ it seeks to remedy.

A complete ban can be narrowly tailored, but only if each activity within the

proscription’s scope is an appropriately targeted evil.” Frisby v. Schultz, 487 U.S.

474, 485, 101 L. Ed. 2d 420, 432 (1988) (citation omitted). I believe the statute fails

to satisfy the requirements that must be met to pass intermediate scrutiny.

 I recognize the important governmental interest in preventing juror

harassment, but I also recognize the countervailing fundamental right to challenge

governmental action in a nonviolent manner. “[T]he assertion of a valid

governmental interest ‘cannot, in every context, be insulated from all constitutional

 15
 STATE V. MYLETT

 McGEE, C.J., dissenting

protections.’” Packingham v. North Carolina, 582 U.S. __, __, 198 L. Ed. 2d 273, 281

(2017). As I discuss below with regard to Defendant’s overbreadth analysis, the

statute is extremely broad in scope—not “narrowly tailored.” “A person is guilty of

harassment of a juror if he: . . . . As a result of the prior official action of another as

a juror in a grand jury proceeding or trial, threatens in any manner or in any place,

or intimidates the former juror or his spouse.” N.C.G.S. § 14-225.2(a)(2) (emphasis

added). The statute is without any real limitation beyond its limitation on the type of

speech that is proscribed. For example, the statute does not include any express

limitations with respect to: time; place; persons who may commit the offence; what

kind of “official action” is sufficient to trigger the statute; the method of making or

communicating a threat; the intent to actually threaten, or how “threat” is defined or

proven; the intent to actually intimidate, or how “intimidation” is defined or proven;4

or the reasonableness of a juror’s reaction to the alleged threat or intimidation. Nor

does it clarify whether a juror’s subjective feelings are relevant to the analysis.5 I

believe N.C.G.S. § 14-225.2(a)(2) is “more restrictive than necessary to achieve [the

legitimate government] interest” involved. Hest Techs., 366 N.C. at 298, 749 S.E.2d

 4 In the federal context, a defendant must intend that his actions will be perceived as a “true
threat.” Elonis, 575 U.S. at __, 192 L. Ed. 2d at 16-17. The State’s position at trial was that no specific
intent was required; that the issue for the jury was “not whether [D]efendant intended to threaten or
intended to intimidate[,]” only whether the jurors “were indeed intimidated, or were indeed
threatened[.]” The State informed the jury during its closing argument that no such intent was
required.
 5 In the present case, the State elicited lengthy testimony concerning alleged fears by the jurors

that Defendant, Dan, or Kathryn might come to the jurors’ houses to harm them.

 16
 STATE V. MYLETT

 McGEE, C.J., dissenting

at 436 (citation omitted); see also McCullen, 573 U.S. at __, 189 L. Ed. 2d at 520

(citation omitted) (the statute cannot “‘regulate expression in such a manner that a

substantial portion of the burden on speech does not serve to advance its goals’”).

 Further, it cannot be said with confidence that the statute “‘leave[s] open

ample alternative channels for communication of the information[,]’” Bishop, 368

N.C. at 874–75, 787 S.E.2d at 818, because the statute, as interpreted in the majority

opinion, makes almost any expression of dissatisfaction to a juror, based upon the

juror’s prior official actions, subject to prosecution. It is unclear how anyone who

wanted to express dissatisfaction in response to a verdict—or other official action

rendered by a juror—could determine what methods of communication might be

interpreted as “threatening” or “intimidating” under the statute. The statute could

well have a significant chilling effect on such expression. For example, there is

nothing in the statute as interpreted in the majority opinion that would prevent

prosecution of a group of people who had gathered in a public space outside a

courthouse to voice their dissatisfaction with a verdict in a high profile case. The

mere public gathering of people angry with a verdict could be deemed “threatening”

or “intimidating,” no matter what anyone in the crowd verbally or physically

communicated in the presence of the departing jurors. Based upon the majority

opinion’s holding, it is certain that a demonstrator shouting to departing jurors that

the jurors had convicted an innocent person and should feel bad for having done so,

 17
 STATE V. MYLETT

 McGEE, C.J., dissenting

could be prosecuted in North Carolina. See Black, 538 U.S. at 365, 155 L. Ed. 2d at

555-56 (citations and quotation marks omitted) (“It is apparent that the provision as

so interpreted would create an unacceptable risk of the suppression of ideas. . . . . As

interpreted . . ., the provision chills constitutionally protected political speech

because of the possibility that the Commonwealth will prosecute—and potentially

convict—somebody engaging only in lawful political speech at the core of what the

First Amendment is designed to protect.”). Further, the State may not rely on

prosecutorial discretion in order to save an otherwise unconstitutional statute:

 Not to worry, the Government says: The Executive Branch
 construes § 48 to reach only “extreme” cruelty, and it
 “neither has brought nor will bring a prosecution for
 anything less.” The Government hits this theme hard,
 invoking its prosecutorial discretion several times. But the
 First Amendment protects against the Government; it does
 not leave us at the mercy of noblesse oblige. We would not
 uphold an unconstitutional statute merely because the
 Government promised to use it responsibly.

United States v. Stevens, 559 U.S. 460, 480, 176 L. Ed. 2d 435, 451 (2010) (citations

omitted). I do not believe the statute survives intermediate scrutiny. A “true threat”

requirement could likely save the statute in this regard, but the majority opinion

holds there is no such requirement.

 However, because I believe strict scrutiny is actually the appropriate standard

for this case, I would hold that the restrictions on speech in the statute “are

presumptively unconstitutional and may be justified only if the government proves

 18
 STATE V. MYLETT

 McGEE, C.J., dissenting

that they are narrowly tailored to serve compelling state interests.” Bishop, 368 N.C.

at 874, 787 S.E.2d at 818 (citations omitted). “The State must show not only that a

challenged content based measure addresses the identified harm, but that the

enactment provides ‘the least restrictive means’ of doing so. Given this ‘exacting

scrutiny,’ it is perhaps unsurprising that few content based restrictions have survived

this inquiry.” Bishop, 368 N.C. at 877-78, 787 S.E.2d at 820 (citations omitted).

Obviously I do not believe the statute meets this demanding standard, and I would

hold that N.C.G.S. § 14-225.2(a)(2) “restricts speech, not merely nonexpressive

conduct; that this restriction is content based; and that it is not narrowly tailored to

the State’s asserted interest in protecting [jurors and the judicial process] from the

harms of [potential juror intimidation].” Id. at 880, 787 S.E.2d at 822. “It is well

established that, as a general rule, the Government ‘may not suppress lawful speech

as the means to suppress unlawful speech.’ That is what North Carolina has done

here. Its law must be held invalid.” Packingham, 582 U.S. at __, 198 L. Ed. 2d at

283 (citation omitted). I would hold that N.C.G.S. § 14-225.2(a)(2) “violates the First

Amendment’s guarantee of the freedom of speech.” Bishop, 368 N.C. at 880, 787

S.E.2d at 822.

 II. As Applied

 Assuming, arguendo, N.C.G.S. § 14-225.2(a)(2) is not unconstitutional on its

face, I would hold that it was unconstitutional as applied in the present case. Because

 19
 STATE V. MYLETT

 McGEE, C.J., dissenting

I believe the First Amendment is implicated in this case, the actions of Defendant

and his associates were protected by the First Amendment absent sufficient evidence

that their actual conduct demonstrated Defendant had made an agreement with

either Dan or Kathryn to communicate a “true threat” to one or more of the six jurors

involved, and that they intended to follow through with their intent to intimidate at

least one juror at the time the agreement was made. After thoroughly reviewing the

trial testimony of all the witnesses, and watching the video footage of the actual

interactions between the different parties, I cannot find evidence of conduct reaching

the level of a “true threat,” or of any conspiracy to communicate such a “true threat.”

 In the present case, all six of the jurors who testified said that the content of

Defendant’s speech—as well as that of Dan and Kathryn—was limited to the

following, or variations thereof: telling the jurors that their verdict was wrong, and

that Dan was innocent; telling the jurors that their verdict had ruined Dan’s life;

telling the jurors that, due to their verdict, Dan would not be able to find a job; and

telling the jurors that they hoped the jurors could “sleep well” and “live with

themselves.” Every juror testified that no one in Defendant’s party made any

statements indicating an intent to physically injure anyone, or an intent to act

violently in any manner. Every juror testified that none of the physical actions of

Defendant or the other parties demonstrated an intent to physically harm any juror.

Some jurors did testify that they felt intimidated, and that they formed concerns that

 20
 STATE V. MYLETT

 McGEE, C.J., dissenting

Defendant, Dan, or Kathryn could, at some later time, try and track them down at

their homes and harm them. However, not a single juror could articulate anything

concrete that happened at the courthouse in support of their fears that they might be

in some future danger at the hands of Defendant, Dan, or Kathryn.

 The video does not show any threatening actions by Defendant, Dan, or

Kathryn. Every juror explained that their feelings of fear or anxiety were primarily

based upon their knowledge that Dan had been in a violent fight in the past (where

Dan was badly beaten), that Defendant had been present at that fight, and that Dan

had acted belligerently toward the police and others following that fight as they were

attempting to aid him. No juror articulated anything that Defendant or the others

had done beyond expressing displeasure with the jury verdict in a manner the jurors

felt was aggressive and disrespectful. I can find nothing that rose to the level of a

“true threat” in the evidence presented at trial.

 More importantly to this analysis, the trial court did not give any instructions

defining what could constitute a “threat” or “intimidation.” Specifically, the

instruction given allowed the jury to convict Defendant without making any

determination that the State proved beyond a reasonable doubt that anything

Defendant, Dan, or Kathryn did constituted a “true threat,” or that limited any

conspiracy to one in which the alleged conspirators intended to communicate any

“true threat.” Brandenburg v. Ohio, 395 U.S. 444, 448–49, 23 L. Ed. 2d 430, 434

 21
 STATE V. MYLETT

 McGEE, C.J., dissenting

(1969) (as applied First Amendment violation found when “[n]either the indictment

nor the trial judge’s instructions to the jury in any way refined the statute’s bald

definition of the crime in terms of mere advocacy not distinguished from incitement

to imminent lawless action”). In the present case, the jury acquitted Defendant on

all the charges requiring proof that Defendant actually “threatened” or “intimidated”

the jurors—even under the broad definitions of “threat” and “intimidate” that they

were allowed to apply. Because Defendant was convicted based upon his protected

speech, and the trial court’s instructions did not require the jury to find a conspiracy

to communicate a “true threat” in order to convict Defendant, I would also find the

statute violated Defendant’s First Amendment rights as applied to him in this case.

 III. Overbreadth

 For the reasons articulated above, I would also hold that the statute is facially

overbroad under the First Amendment. “According to our First Amendment

overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount

of protected speech.” United States v. Williams, 553 U.S. 285, 292, 170 L. Ed. 2d 650,

662 (2008) (citation omitted). “[T]he threat of enforcement of an overbroad law deters

people from engaging in constitutionally protected speech, inhibiting the free

exchange of ideas.” Id. (citations omitted). “The first step in overbreadth analysis is

to construe the challenged statute; it is impossible to determine whether a statute

reaches too far without first knowing what the statute covers.” Id. at 293, 170 L. Ed.

 22
 STATE V. MYLETT

 McGEE, C.J., dissenting

2d at 662. N.C.G.S. § 14-225.2(a)(2) prohibits any person from taking any action that

a juror, law enforcement officer, or prosecutor deems to be “threatening” or

“intimidating”—including acts of protected speech or expressive conduct—so long as

that action is interpreted as having been taken in response to any official action of a

juror. The prohibited action may occur at any time, and in any place, and the State

need not prove that the person had any intent to “threaten” or “intimidate,” only that

the action could be interpreted as “threatening” or “intimidating.” The amount of

protected speech potentially prohibited by the statute is substantial, and I would hold

that it “is facially invalid [because] it prohibits a substantial amount of protected

speech.” Id. at 292, 170 L. Ed. 2d at 662. However, I believe a statute could be drafted

in such a manner as to pass constitutional muster by including a “true threat”

requirement: “[T]his opinion should not be interpreted as barring a State from

enacting more specific laws than the one at issue. Specific criminal acts are not

protected speech even if speech is the means for their commission.” Packingham, 582

U.S. at __, 198 L. Ed. 2d at 281; Bishop, 368 N.C. at 878 n.3, 787 S.E.2d at 821 n.3

(citations omitted).

 IV. Void for Vagueness

 “As generally stated, the void-for-vagueness doctrine requires that a penal

statute define the criminal offense with sufficient definiteness that ordinary people

can understand what conduct is prohibited and in a manner that does not encourage

 23
 STATE V. MYLETT

 McGEE, C.J., dissenting

arbitrary and discriminatory enforcement.” Kolender v. Lawson, 461 U.S. 352, 357,

75 L. Ed. 2d 903, 909 (1983) (citations omitted). Based on my analysis of the facts

and the law above, I would find this statute is void for vagueness. There are many

actions that could lead to prosecution under the statute that ordinary people would

not understand as prohibited, and would instead understand as an exercise of free

speech in response to governmental action. I believe the statute does encourage

arbitrary and discriminatory enforcement, including in the present case.

 The majority opinion holds that, because this Court found the term

“intimidate” was not unconstitutionally vague in Hines, 122 N.C. App. at 552-53, 471

S.E.2d at 114, Defendant’s argument fails. However, Defendant’s argument is not

limited to the definition of “intimidate,” and the majority opinion’s holding here is

predicated on its earlier holding that, even for First Amendment purposes, “threaten”

and “intimidate” are not required to be defined as “true threats.” Instead, the

majority opinion adopts the dictionary definition of “intimidate” as set forth in Hines:

“‘Intimidate’ is commonly defined as ‘to make timid or fearful: inspire or affect with

fear: frighten.’” Id. at 552, 471 S.E.2d at 114 (citation omitted). I do not believe, for

example, the statute as written “define[s] the criminal offense with sufficient

definiteness that ordinary people can understand” what conduct might make a juror

feel “timid” or “fearful;” when or where protest against official action of a juror will

be lawful, and when or where such protest will be unlawful; what “official actions”

 24
 STATE V. MYLETT

 McGEE, C.J., dissenting

are covered by the statute; or whether any intent to “frighten” or “make feel timid” is

actually required. Kolender, 461 U.S. at 357, 75 L. Ed. 2d at 909.

 V. Jury Instruction

 I would hold that the trial court erred in denying Defendant’s request for jury

instructions properly defining “intimidation.” There was considerable confusion at

the charge conference concerning what specific words would be included in the

instruction because the pattern instruction is actually an instruction for N.C.G.S. §

14-225.2(a)(1) with a footnote stating: “This instruction deals with harassing,

intimidating, or communicating with a prospective or sitting juror as defined in G.S.

14-225.2(a)(1). For threatening or intimidating a former juror as defined in G.S. 14-

225.2(a)(2) amend the charge accordingly.” N.C.P.I. – Crim. 230.60. The State made

a last minute request to change its written request from simply “intimidating” to

“threatening or intimidating.” Defendant had come to the charge conference with two

written alternative proposals to add to the pattern instruction, one of which stated:

“Regarding the term intimidate, the State would be required to prove that

[D]efendant means to communicate a serious expression of an intent to commit an

act of unlawful violence to a particular individual or group of individuals. See State

v. Bishop, __ N.C. __, 787 S.E.2d 814, FN3 (2016).” Defendant’s attorney argued that

 25
 STATE V. MYLETT

 McGEE, C.J., dissenting

defining “intimidate” was required “in order to find the statute constitutional[.]”6

T438 The trial court denied Defendant’s request, and instructed the jury without

any definition of “threaten” or “intimidation,” and without any requirement that the

evidence demonstrated that Defendant conspired with either Dan or Kathryn to

communicate a “true threat,” as follows:

 [D]efendant has been charged with threatening and or
 intimidating a juror. Now I charge that for you to find
 [D]efendant guilty of this offense, the State must prove
 three things beyond a reasonable doubt. First, that a
 person had served as a juror and had just been discharged
 from that jury service. Second, that [D]efendant
 threatened and/or intimidated that person. And, third,
 that [D]efendant threatened and/or intimidated that
 former juror as a result of a prior official action of that
 person as a juror.

 So I charge that if you find from the evidence beyond a
 reasonable doubt that on or about the alleged date a person
 had served as a juror, and had been discharged from that
 jury service as a juror, and that [D]efendant threatened
 and/or intimidated that person, and that [D]efendant
 intended thereby to threaten and/or intimidate that person
 as a result of a prior official action of that person as a juror,
 it would be your duty to return a verdict of guilty.7

 6 I also note that Defendant’s attorney asked for an instruction on specific intent, and
requested that the instruction conform to the language of the indictment, which stated that Defendant
“did threaten and intimidate” the jurors, not that Defendant “threatened or intimidated” the jurors.
The trial court also denied those requests, but Defendant does not argue those issues on appeal.
 7 I note in the first paragraph, where the trial court is laying out the elements of the crime, it

included no scienter element. The instruction as rephrased in the second paragraph seems to include
an element of intent; however, based upon the charge conference and the first paragraph of the
instruction, I read “intended thereby” to mean that Defendant had to intend for his “threatening or
intimidating” actions to be in response to the juror’s prior service. The Ninth Circuit, reviewing
Supreme Court cases, has held: “We are therefore bound to conclude that speech may be deemed
unprotected by the First Amendment as a ‘true threat’ only upon proof that the speaker subjectively

 26
 STATE V. MYLETT

 McGEE, C.J., dissenting

 The trial court’s denial of the requested instruction allowed the jury to convict

Defendant on a theory that, in response to Dan’s verdict, he conspired with another

person “‘to make timid or fearful: inspire or affect with fear: [or] frighten’” a juror,

Hines, 122 N.C. App. at 552, 471 S.E.2d at 114 (citation omitted)—instead of

requiring the State to prove that the conspiratorial intent of Defendant and another

was to communicate a “true threat” as required by the First Amendment. I would

vacate Defendant’s conviction on this basis as well.

 VI. Conspiracy

 I would first hold that Defendant’s motion to dismiss the conspiracy charge

should have been granted because there was no evidence presented that Defendant

made an agreement with anyone to communicate a “true threat” to any juror.

However, even absent consideration of the constitutional issues discussed above, I do

not believe there was sufficient evidence presented at trial to support the charge of

conspiracy even under the majority opinion’s reasoning. “A criminal conspiracy is an

agreement between two or more persons to do an unlawful act or to do a lawful act in

an unlawful way or by unlawful means.” State v. Gibbs, 335 N.C. 1, 47, 436 S.E.2d

321, 347 (1993) (citations omitted).

intended the speech as a threat.” U.S. v. Cassel, 408 F.3d 622, 633 (9th Cir. 2005) (footnote omitted).
For federal criminal statutes, the United States Supreme Court requires proof that a defendant
intended his communication to be perceived as a true threat. Elonis, 575 U.S. at __, 192 L. Ed. 2d at
16-17.

 27
 STATE V. MYLETT

 McGEE, C.J., dissenting

 The State was required to prove that Defendant, along with either Dan or

Kathryn, made an agreement to harass at least one juror by threats or intimidation,

and that the conspirators “intended the agreement to be carried out at the time it was

made.” State v. Euceda-Valle, 182 N.C. App. 268, 276, 641 S.E.2d 858, 864 (2007)

(citations and quotation marks omitted). I disagree with the majority opinion’s

contention that Defendant’s argument “that the State presented insufficient evidence

that he intended ‘to threaten or menace any juror’” is irrelevant to the conspiracy

charge. While it is true that there is nothing inconsistent or improper when a jury

convicts on a conspiracy charge but acquits on the underlying criminal charge—each

co-conspirator must actually form the intent to commit the underlying offense before

they can conspire with one another to commit that offense. Id. As the trial court

correctly instructed, it was the State’s burden to prove that Defendant and any co-

conspirator “intended at the time the agreement was made that it would be carried

out[.]” (Emphasis added). Finally, “[w]hile conspiracy can be proved by inferences

and circumstantial evidence, it cannot be established by a mere suspicion, nor does a

mere relationship between the parties or association show a conspiracy.” Id. (citations

and quotation marks omitted) (emphasis added); see also State v. Golphin, 352 N.C.

364, 458, 533 S.E.2d 168, 229–30 (2000) (citation omitted) (“If, however, the evidence

‘is sufficient only to raise a suspicion or conjecture as to either the commission of the

offense or the identity of the defendant as the perpetrator, the motion to dismiss must

 28
 STATE V. MYLETT

 McGEE, C.J., dissenting

be allowed.’”). I find the evidence of conspiracy in the present case amounts to nothing

more than mere suspicion or conjecture based upon the relationship between the

alleged conspirators and the fact that they were together when they expressed to the

jurors their disagreement with Dan’s conviction.

 First, the State conceded at trial that no conspiracy occurred while Defendant,

Dan, or Kathryn were still inside the courtroom.8 As the State argued in its closing:

“I’m not saying they planned it beforehand. I’m saying they acted on it when they

got out into the lobby[.]” Therefore, I review the evidence from the “lobby,” or common

area right outside the courtroom. For a significant amount of time, Defendant was

alone in the lobby. Rose Nelson (“Nelson”) was the first juror to leave the courtroom,

but there could not have been any conspiracy to intimidate Nelson, because she left

the courtroom before Dan or Kathryn joined Defendant in the lobby. None of

Defendant’s interactions between jurors Kinney Baughman (“Baughman”), William

Dacchille (“Dacchille”), Denise Mullis (“Mullis”), or Lorraine Ratchford (“Ratchford”),

as they exited the hallway and walked to the jury room, could have constituted

evidence of a conspiracy either—for the same reason: Dan and Kathryn were still in

the courtroom at that time. Therefore, during these initial confrontations, when

Defendant was alone, Defendant had already formed the intent, and acted upon that

intent, to tell the jurors things like “he hoped that [Nelson] could live with [herself]

 8 In order to fully review the relevant events, it is necessary to watch the video.

 29
 STATE V. MYLETT

 McGEE, C.J., dissenting

because [she] had convicted an innocent man, and then as [Nelson] was making [her]

way to the stairs trying to get down the stairs, he was saying something about the

crooked Boone police, and he hoped that [she] slept well[;]” that Dan was “an innocent

man, he’s an innocent man[;]” that “[Mullis] got it wrong, that [she] made a

mistake[;]” and “congratulations, you [Ratchford] just ruined [Dan’s] life.” The jury

determined that these actions did not constitute “threatening” or “intimidating” the

jurors even under the broad definitions of these terms allowed by the trial court.

Dacchille and Ratchford testified that they did not have any further disturbing

interactions with Defendant and, therefore, they had no such interactions after Dan

and Kathryn had joined Defendant. Mullis testified that while she was in the jury

room she “could hear voices,” but “didn’t know what was being said[,]” and that

nobody said anything to her as she left the jury room and entered the stairwell.

 The only juror to actually engage with the family in the lobby—as opposed to

silently walking past Defendant, Dan, and Kathryn while leaving the lobby—was

Baughman. Baughman was in the jury room—with Dacchille, Mullis, and

Ratchford—when first Kathryn, followed by Defendant’s and Dan’s mother (“Ms.

Mylett”), then Dan, exited the courtroom and joined Defendant in the lobby.9

Kathryn was crying as she left the courtroom and walked around the open courtroom

 9 I note that the reason Defendant, Dan, Kathryn, and Ms. Mylett remained in the lobby during
the period that followed appears to be that they were waiting for Dan’s attorney to finish up in the
courtroom and join them. Once Dan’s attorney exited the courtroom and joined them in the lobby,
they all immediately left the courthouse together.

 30
 STATE V. MYLETT

 McGEE, C.J., dissenting

door toward Defendant, who was standing still with his back to the courtroom wall.

There was a period of less than one second when Kathryn’s face was facing in

Defendant’s direction, and Defendant clearly noticed Kathryn was upset. Defendant

immediately approached her to place his hand on her head, then her back, in what

appeared to be a consoling gesture, as she walked in a semicircle and stood with her

face inches away from the exterior wall of the courtroom.

 The video shows that this approximately one-second period when Defendant

saw that Kathryn was crying was the only moment Defendant could have made eye

contact with her during the time period from when she joined Defendant in the lobby

and Baughman’s exit from the lobby—when Baughman entered the stairwell.

Defendant never made eye contact with Dan or appeared to communicate with him

in any manner during this period of time. There is nothing about the interaction

between Defendant and Kathryn that suggests Defendant was doing anything other

than trying to console her. I do not believe any other possible inference rises above

the level of speculation or conjecture. Seconds after leaving the courtroom, Dan

appeared to notice Baughman as he was walking out of the jury room, and Dan

walked several steps toward the jury room door. He stopped when he was

approximately seven to eight feet away from the jury room door, just as Baughman

was emerging. Ms. Mylett was behind Dan, and Kathryn was still near the courtroom

wall, but she then started walking toward Baughman. Defendant walked behind Ms.

 31
 STATE V. MYLETT

 McGEE, C.J., dissenting

Mylett and stood a couple of feet behind his brother as Baughman walked by first

Dan, then Ms. Mylett, then Kathryn. From the time Baughman entered the lobby,

the attention and focus of Defendant, Dan, Kathryn—and Ms. Mylett—was almost

exclusively on Baughman. The video does not show any discernible interaction

between Defendant and anyone other than Baughman—there is no video evidence

that Defendant interacted with Dan or Kathryn after his initial, brief contact with

Kathryn.

 From the video, it appears that Dan and Kathryn began talking to Baughman

right as Baughman began to walk past them, and Dan stepped back and away from

Baughman to make more room for Baughman to pass by him. Defendant was behind

Dan, approximately five feet away from Baughman, and Baughman continued and

walked past Ms. Mylett, then Kathryn. It is unclear from the video whether

Defendant or Ms. Mylett were engaging with Baughman at this time, but Baughman

testified that Defendant spoke to him as he initially walked past the family, saying

“that his brother was an innocent man, that [Baughman] had done wrong.” The

attention of Defendant, Dan, and Kathryn was constantly focused on Baughman

throughout this encounter; they were never in positions to make eye contact with

each other, and they did not touch each other. Logically, by this time—when

Defendant, Dan, and Kathryn had all begun to express their frustration over the

verdict with Baughman—the conspiracy to intimidate jurors—if any—would have

 32
 STATE V. MYLETT

 McGEE, C.J., dissenting

already been committed. The actions of Defendant, Dan, and Kathryn following this

initial confrontation were simply a continuation of what had already begun, and add

little to the sufficiency analysis for the conspiracy charge.

 Baughman first testified that the family “surrounded” him, but upon watching

the video, he agreed: “Not surround me. They were grouped there in front of me as I

was coming out of the room.” Both Dan and Defendant had their hands in their pants

pockets as Baughman walked past them, and Kathryn was holding the shoulder strap

of a leather bag with both hands. Baughman further testified that Kathryn “pounced”

on him and was telling him “but you convicted [Dan], you sent him to jail, you ruined

his life and it’s all your fault.” Baughman testified that Dan “did a lot of shaking of

his head.” When Baughman was first confronted after leaving the jury room,

Dacchille, Ratchford, and Mullis were still in the jury room. None of them could hear

what was being said except Ratchford, who testified that she heard Kathryn

“screaming [Dan will] never get a job.” Dacchille walked from the jury room directly

to the stairwell while Baughman was still in the lobby, but nobody engaged him.

 Baughman kept walking toward the hallway, and neither Defendant nor Dan

moved at all from where they had been standing. Kathryn walked away from

Baughman. From the video, Kathryn was the most animated, but her most animated

actions occurred when she was on the opposite side of the room from Baughman.

Baughman was nearing the hallway when he stopped, turned, and engaged with

 33
 STATE V. MYLETT

 McGEE, C.J., dissenting

Defendant, who was saying something to him. Baughman then walked toward

Defendant, and engaged in a brief conversation with him. Baughman testified as to

the reason he engaged with Defendant, stating “you know, I’m a former professor, I

like to explain things.” Baughman was trying to explain to Defendant why the jury

reached the verdict that it had reached, but Defendant and Kathryn were

interrupting him to say that Dan was innocent. Baughman then decided to walk to

the stairwell, instead of down the hallway, so he again walked across the lobby and

past the family. It appears that Defendant and Kathryn continued to argue with

Baughman as Baughman walked by and into the stairwell. Defendant, Kathryn,

and Dan all moved away from Baughman as he passed by, insuring that Baughman’s

path out of the lobby was not blocked. From the video evidence, there is nothing

suggesting Defendant, Dan, or Kathryn had communicated with each other in any

manner during this relevant period,10 much less conspired to harass Baughman.

Although conspiracy does not require the commission of the underlying crime, the

fact that Defendant, Dan, and Kathryn clearly moved away from Baughman

whenever he was trying to walk past them was certainly not evidence that could have

been reasonably interpreted as supporting the conspiracy charge.

 There was also no testimonial evidence suggesting any conspiracy to threaten

or intimidate. When the State asked what tone of voice Defendant was using at this

 10 Other than when Defendant briefly placed his hand on Kathryn as she cried by the
courtroom wall.

 34
 STATE V. MYLETT

 McGEE, C.J., dissenting

time, Baughman testified: “Well, it’s firm, but, I mean, he’s not yelling at me here.

So the way I recall was, [Defendant was saying] my brother was innocent, he’s an

innocent man, and, you know, we had done wrong. In this case, you know, I’d done -

- you done wrong.” Baughman testified that Defendant was not raising his voice, but

that he was talking in a tone that was “not pleasant[,]” and that Defendant “was

clearly upset about the verdict.” Baughman testified that during the encounter he

“didn’t feel physically confronted[,]” or that anyone was “about to inflict violence” on

him—that he “didn’t feel like anybody was going to attack me here that day[.]”

Concerning his interactions with the family, the State asked Baughman: “Had you

ever had a quote-unquote discussion like this before?” Baughman answered that he

had not in this particular context where his “civic duty” and “the law is concerned,”

but that “I think probably we’ve all been in animated discussions before.” Baughman

further testified that he never heard anyone talking about wanting to intimidate the

jurors in any manner. Every other juror also testified that they did not hear

Defendant conspiring with Dan or Kathryn, and none of them testified that they

witnessed any actions that they believed indicated any such conspiracy, or that they

believed any such conspiracy existed. It was the State’s burden to elicit testimony

from the jurors that could support the conspiracy charge, and I do not believe that

burden was met.

 I do not believe that Baughman’s testimony or the video evidence provides

 35
 STATE V. MYLETT

 McGEE, C.J., dissenting

evidence from which a conspiracy can be reasonably inferred. Baughman’s testimony

was that he engaged in debate about the verdict with Defendant, who was arguing

that Dan was innocent; that Kathryn was the only one who raised her voice; and that

Dan did not engage verbally as much—he mainly just shook his head. Baughman did

not give any testimony that Defendant engaged in any conduct associated directly

with either Dan or Kathryn beyond the mere fact that they were all in the lobby

together as they expressed to him their disagreement with the verdict. Baughman

did testify that he did not feel that he was being threatened, that he had been in

“similarly animated discussions” in other contexts, and that he did not hear anything

that would suggest Defendant was conspiring with anyone to threaten or intimidate

him. Further, nothing in Baughman’s testimony suggested that he observed any non-

verbal conduct suggesting any such conspiracy. As discussed above, I also believe the

video evidence fails to provide competent evidence of a conspiracy between Defendant

and Dan or Kathryn. I do not believe Baughman’s testimony concerning fear he

allegedly felt after he had left the courthouse adds anything to the State’s conspiracy

case. Because the totality of “the evidence [wa]s sufficient only to raise a suspicion

or conjecture as to . . . the commission of the offense” I believe “the motion to dismiss

[should have been] allowed.” Golphin, 352 N.C. at 458, 533 S.E.2d at 229–30 (citation

 36
 STATE V. MYLETT

 McGEE, C.J., dissenting

omitted).11

 11 Although I believe the critical period is limited to the time leading up to the initial group
confrontation with Baughman, I would also hold, considering all the evidence, that the evidence was
insufficient to survive Defendant’s motion to dismiss with respect to any of the jurors individually, or
with respect to “the jurors,” in part, or as a whole.

 37